IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TRACI MOULTRIE and | : | |
| HENRY CHAMBERS, | : | |
| | : | CIVIL ACTION FILE NO. |
| Plaintiffs, | : | 1:13-cv-01579 |
| | : | |
| vs. | : | **JURY TRIAL DEMANDED** |
| | : | |
| GEORGIA DEPARTMENT | : | |
| OF CORRECTIONS; | : | |
| SHARON CASHIN, | : | |
| in her individual | : | |
| capacity; MARCIA McINTYRE, | : | |
| in her individual capacity; and | : | |
| MICHAEL KRAFT, in his | : | |
| individual capacity, | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT

Traci Moultrie ("Moultrie") and Henry Chambers ("Chambers") respectfully

submit this Amended Complaint on the following grounds:[1]

## Jurisdiction and Venue

1.

This is an action under Title VII of the Civil Rights Act of 1964, as

---

[1] This Amended Complaint includes the previous claim filed by Henry Chambers.
As such, this Amended Complaint should simply supplant the original Complaint
filed on May 9, 2013.

amended, 42 U.S.C. § 2000e *et seq.*; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, both asserted via 42 U.S.C. § 1983.

2.

Plaintiffs' claims present federal questions over which the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

3.

Venue is proper in this district under 28 U.S.C. § 1391(b) because one or more of the Defendants reside in the Northern District of Georgia and because the unlawful conduct giving rise to the claims occurred in this District.

4.

Plaintiffs have timely filed Charges of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") or the Georgia Department on Equal Opportunity ("GDEO"). Plaintiffs have received their respective Notices of Right to Sue.  Each Plaintiff has filed suit within 90 days of receipt of his/her Right to Sue notices and otherwise satisfied all administrative prerequisites to filing their claims in this Amended Complaint.

## The Parties

5.

Plaintiff Moultrie is a citizen of the United States and a former employee of the Defendant Department of Corrections.  Moultrie is a black woman.

6.

Plaintiff Chambers is a citizen of the United States and a current employee of the Defendant Department of Corrections.  Chambers is a black man.

7.

Defendant Department of Corrections (the "Department") is an agency of the State of Georgia and is subject to this Court's jurisdiction.  The Department may be served by delivering a copy of the Amended Complaint and summons to Commissioner Brian Owens at 300 Patrol Road, Forsyth, Georgia, 31029.

8.

The Department is a state governmental authority and is subject to suit under 42 U.S.C. § 1983 and Title VII.

9.

Defendant Sharon Cashin is a resident of the Middle District of Georgia and is subject to this Court's jurisdiction.  She may be served with process via personal service at her residence.

3

10.

Defendant Cashin was the Chief Probation Officer in the Lawrenceville location at all times material to this Amended Complaint.  Cashin is sued in her individual capacity.

11.

Defendant Michael Kraft is a resident of the Middle District of Georgia and is subject to this Court's jurisdiction.  He may be served with process via personal service at his residence.

12.

Defendant Kraft was the Field Operations Manager over the Lawrenceville location at times material to this Amended Complaint.  Kraft is sued in his individual capacity.

13.

Defendant Marcia McIntyre is a resident of the Northern District of Georgia and is subject to this Court's jurisdiction.  She may be served with process via personal service at her residence.

14.

Defendant McIntyre was the Field Operations Manager for the Lawrenceville location at times material to this Amended Complaint.   McIntyre is sued in her individual capacity.

**The Underlying Facts**

Traci Moultrie

15.

Moultrie began her career at the Department of Corrections as a Probation Officer in July 1999.   From the outset of her career, she was stationed at the Lawrenceville office.

16.

Within that office, she was supervised by both white and black people.   For the first ten years of her employment, Moultrie never filed an internal grievance with the Department of Corrections.

17.

Within that same ten-year time frame, Moultrie received only one disciplinary measure – a written warning about a computer issue.

18.

From 1999 to 2009, Moultrie was regularly assigned to special tasks and assignments.  For example, she was appointed as the Commissioner's designee to the Fulton County Jail Population Committee and to the Process Action Team to Offender Administration.  Moultrie also sat on numerous interview boards and trained new officers regularly.

19.

In 2009, Moultrie's eighteen-month special assignment to the Offender Administration program at the Central office ended, and she returned to the Lawrenceville probation office.

20.

Approximately five months later, Defendant Chief Probation Officer Sharon Cashin, a white woman, was transferred from the Athens office to the Lawrenceville office.  Cashin was the highest ranking officer at the Lawrenceville location.   It was not until Cashin became the CPO that Moultrie's employment at the Department began to take a downward spiral.

21.

Cashin reported to the Field Operations Manager for the North East region.  For periods relevant to this Amended Complaint, either Michael Kraft or

6

Marcia McIntyre served as the Field Operations Manager.  As such, they were Cashin's immediate supervisors.  For certain employment decisions made within the Lawrenceville office, Cashin was required to seek her supervisors' approval.  Upon information and belief, that approval was freely given with little or no meaningful review or, whether by Defendants' official policies or by Defendants' unofficial practices, was not required.

22.

In 2009, a long-standing flexible work hour program, which allowed several Department employees to work secondary jobs, was abruptly changed.  Every officer adversely affected by this policy change was black.  Moultrie filed an internal grievance about the change in the policy, as it cost her several thousand dollars in supplemental income every year.  This was the first grievance Moultrie had ever filed since the start of her Department career in 1999.  The grievance was dismissed as untimely.

23.

In August 2009, Moultrie filed her second internal grievance in ten years against a Probation Officer III named Clarke Arick, a white man who had previously worked under Cashin in the Athens office.  Moultrie filed the grievance because Arick had berated her in the office lobby in front of her co-workers and

7

probationers. Arick's scolding of Moultrie occurred shortly after he was investigated by Kraft, who had received several complaints made by black employees within the Lawrenceville office about Arick's conduct.   Although Moultrie had not launched any such complaint herself, Arick lashed out at her undeservedly shortly after the probe. Moultrie specifically mentioned in that grievance that Arick treated her and her black co-workers rudely, but did not treat her white co-workers with the same disrespect.   This grievance was never addressed by the Department.

24.

After the internal investigation into Arick's conduct, five employees, four of whom were black, either transferred or were terminated by Cashin.   Upon information and belief, these five employees complained and/or participated in the investigation of the complaints.  In 2010, Arick abruptly resigned.

25.

After Moultrie filed the August 2009 grievance, she applied for several promotions and requested special assignments and training on numerous occasions. Although she ranked in the top three candidates for the promotions, she always lost the spot to a white male co-worker, usually with less experience.  A three-person panel ranked applicants and then provided Cashin with three names.  Cashin made

8

the final decisions not to promote Moultrie.   Likewise, Cashin never afforded Moultrie special assignments or training.

26.

In the entirety of 2011 and the first six months of 2012, there were approximately seven promotions to PO III, three to five training positions, and over ten special assignments made by Cashin.   Every slot was filled by a white person.   Additionally, all promotions to Probation Officer III were awarded to men.

27.

In August 2011, Moultrie fell and fractured her knee cap during a mandatory state-wide training exercise.    Unable to bend or kneel for several months, she could not position herself to shoot her weapon.   Consequently, she did not get recertified to carry a weapon by the January 1, 2012 deadline.  On January 9, 2012, Cashin forced Moultrie to surrender her weapon and permit because she did not qualify.  In her thirteen-year tenure with the Department, Moultrie is unaware of any other officers who failed to qualify for one reason or another being forced to surrender their weapons.  Two days later, Moultrie retested and qualified.  Cashin then returned her weapon.  However, Cashin filled one of the promotions to which Moultrie applied during the first few weeks in January.

28.

On January 20, 2012, Moultrie filed a grievance against Cashin in reaction to having her weapon taken and being passed over for trainings, boards, and special assignment, and promotions.  In that grievance, Moultrie mentioned the preferential treatment of the new officers over the veteran officers.  The vast majority of new officers, recruited by Cashin, were white.  The overwhelming majority of veteran officers, which Cashin inherited when she transferred to Lawrenceville, were black. Finally, Moultrie specifically mentioned in the grievance that she felt as though Cashin's poor treatment of her was retaliatory because of the race discrimination grievance she filed against Arick.   The Department referred her January 2012 grievance to Internal Affairs, which never responded.

29.

On March 19, 2012, Cashin instructed Moultrie's supervisor, Isreal Fowler, to draft a "letter of concern" to Moultrie for not filing a sick leave request form when she was absent one morning for a doctor's appointment regarding her work-related knee injury. There had been some confusion about the appropriate procedure among Cashin, Fowler, and Moultrie prior to the day of the appointment.  Waiting for clarification, but still needing to attend the doctor's visit,

Moultrie informed Fowler that she would be out and taking compensatory time as instructed to do by Department policy.   Despite full knowledge that Moultrie would be absent and that the procedure for requesting leave was unclear, Cashin forced Fowler to discipline Moultrie.

30.

Moultrie filed another grievance based on this improper discipline on March 21, 2012.   In her fourth grievance, Moultrie complained about Cashin's negative treatment of her versus the positive treatment she bestowed upon white officers. Again, this grievance was referred to Internal Affairs, and Moultrie never received any response after the referral.

31.

Less than a month later, Cashin issued Moultrie another frivolous letter of concern based on some speculation that Moultrie was engaging in the spreading of rumors or gossip.  That was untrue.

32.

Moultrie then filed a grievance on May 1, 2012.  Again, Moultrie mentioned "it is common practice in the Lawrenceville Probation Office under the authority of CPO Sharon Cashin to racially discriminate against employees of African

11

American descent."   The grievance was once again forwarded to the abyss of Internal Affairs never to be discussed again.

33.

Less than three months later, the Department terminated Moultrie on July 24, 2012.  The termination was set in motion by Cashin prior to her transfer back to the Athens office in June 2012.   However, Marcia McIntyre signed the termination paperwork.

34.

Moultrie was supposedly terminated for her actions regarding the wrongful arrest of a former probationer. Although several employees committed errors in the process, only Moultrie was disciplined as a result of the wrongful arrest.

35.

Moreover, at least three other officers issued warrants on other expired cases.  One of them, a white officer, issued an arrest warrant forcing a probationer to stay in jail for ten months on an expired case.  Her pay was reduced by 5%. Another white woman officer received no discipline at all for a similar infraction. A black male officer, who never complained of race discrimination or retaliation, received no discipline for the same infraction.

36.

When the Commissioner Designee for Adverse Action, who addressed Moultrie's appeal of her termination, recommended that Moultrie be reinstated, Cashin refused.

37.

The only probation officers terminated while Cashin was the CPO of the Lawrenceville office were women.

Henry Chambers

38.

Chambers began his employment with Defendant as a Probation Officer on May 1, 2006.

39.

As mentioned above, Cashin became Chief of the Lawrenceville Probation Office of the Department of Corrections in 2009.

40.

Prior to her arrival, Chambers had never been disciplined for his performance at the Department.   Within a few months of Cashin's arrival, Chambers received a write-up regarding his case load after a regularly scheduled review.

13

41.

By September 2009, Cashin and other supervisors within the office subjected Chambers to more frequent caseload reviews than his white co-workers.

42.

In February 2010, Cashin wrote Chambers up again based on a case load evaluation.   However, upon rebuttal, Chambers demonstrated that his was improperly scored.  Nevertheless, the discipline was not retracted.

43.

 In December 2010, positions became available for the C.E.R.T squad, which uses two names:  the "Community Emergency Response Team" and the "Correctional Emergency Response Team."  Members of the squad provide law enforcement assistance in the event of a disaster.  Because of the increased duties, probation officers selected for the squad received additional monthly and per task compensation.

44.

Although Chambers was qualified for the program, and would have applied for the position, he never did so because the opportunity was not formally announced or posted.  When Chambers heard unofficially via office gossip about

the squads, he asked Cashin about the positions.  Cashin denied the existence of the C.E.R.T. squads.

45.

Despite this denial, the slots on the C.E.R.T. squads were filled.  Upon information and belief, the only probation officers allowed to try out for the positions in 2010 were white men.  Both white men selected to try out failed certain elements of the test to become C.E.R.T. members.  Nevertheless, those men were allowed to retake the portions of the test that they failed.  Upon information and belief, no black employee was even allowed to take the tests.

46.

After Chambers learned that some of his white male co-workers were selected to try out for the squads, Chambers asked Cashin about the positions on the squads again.  Cashin simply stated that the positions had already been filled.

47.

Those positions were filled by white men.

48.

Chambers went so far as to call the Human Resources staff about future openings on the squads and to register for the opportunity to try out for the positions.  Chambers complied with the instruction to contact the current squad

members by e-mail message and over the phone to display his interest in applying for the next positions.  Chambers was never contacted about any further openings even though several other spots became available.

49.

After repeatedly questioning Cashin about promotional opportunities, Chambers received a 5% reduction in pay based on a trumped up allegation that he was negligent in the performance of his duties in February 2011.

50.

In response to that adverse action, Chambers alerted the Department that the allegations of negligence in duties stemmed from a time frame when he was on medical leave.  Chambers also stated that this discipline was a result of racial discrimination within the Lawrenceville office.  In short, Chambers reported that Cashin disciplined blacks more harshly than whites for the same or similar problems that surfaced within case loads.  He also complained about being passed over for C.E.R.T. squad appointments.

51.

In May 2011, Chambers filed a charge with the Georgia Commission on Equal Opportunity.  In that charge, Chambers complained about the several

promotions and special assignments that were awarded to less qualified white applicants.

52.

Shortly thereafter, Cashin directed Chambers' immediate supervisors to explore ways to end Chambers' employment.

53.

After the filing of the charge, a policy was changed disallowing males to wear dreadlocks.  At that time, Cashin ordered Chambers to cut his dreadlocks or be terminated.

54.

On March 2, 2012, Chambers filed his second charge with the Georgia Commission on Equal Opportunity regarding his belief that he was being discriminated against on the basis of his race and retaliated against for filing his first charge.

55.

Eleven days later, on March 13, 2012, Chambers was written up for issuing a travel permit to a probationer even though he was ordered to do so by a Superior Court judge.

56.

In May 2012, Chambers presented evidence to the Department Statewide Employee Assistance Coordinator regarding the bogus discipline to which he had been subjected.

57.

A month later, Cashin transferred Chambers back to the Athens probation office.

58.

On February 22, 2012, Chambers filed his third charge with the Georgia Commission on Equal Opportunity. In short, Chambers complained that he was being retaliated against due to his previous complaints of discrimination and retaliation.

59.

In the entirety of 2011 and the first six months of 2012, there were approximately seven promotions to PO III, three to five training position, and over ten special assignments made by Cashin. Every slot was filled by a white person.

## Governmental and Decision Maker Liability

60.

At all times material to this Amended Complaint, and while engaging in all

18

of the conduct giving rise to Plaintiffs' claims, the Defendants acted under color of state and local law.

61.

Defendant Cashin was, at all times material to this Complaint, the highest Department official with authority to hire, fire, transfer, demote, promote, discipline, and take other personnel actions affecting employees of the Lawrenceville office of the Department, including Plaintiffs.

62.

Cashin's above-pled employment actions were not subject to, and did not require, higher review or approval.

63.

Her above-pled employment actions were also not subject to appeal or reversal by any other official or entity.

64.

Defendant Cashin was the Department's final decision maker with respect to each of the unlawful employment actions giving rise to this Amended Complaint.

65.

Defendant Cashin was the Department's final policymaking authority with respect to the functions giving rise to this Amended Complaint including, without

limitation, disciplinary actions taken against Plaintiffs.  In making the decisions giving rise to this Amended Complaint, Cashin exercised final policymaking authority delegated to her by the Department.

## Alternative Governmental and Decision Maker Liability

66.

Defendants Kraft and McIntyre were, at all times material to this Amended Complaint, the Department officials with authority to hire, fire, transfer, demote, promote, discipline, and take other personnel actions affecting employees of the Lawrenceville office of the Department, including Plaintiffs.

67.

Kraft's and McIntyre's above-pled employment actions were not subject to, and did not require, higher review or approval.

68.

Their above-pled employment actions were also not subject to appeal or reversal by any other official or entity.

69.

Defendants Kraft and McIntyre were the Department's final decision makers with respect to each of the unlawful employment actions giving rise to this Amended Complaint.

70.

Defendants Kraft and McIntyre were the Department's final policymaking authority with respect to the functions giving rise to this Amended Complaint including, without limitation, disciplinary actions taken against Plaintiffs.   In making the decisions giving rise to this Amended Complaint, Kraft and McIntyre exercised final policymaking authority delegated to them by the Department.

71.

In engaging in the unlawful conduct giving rise to this Amended Complaint, the Defendants acted pursuant to an official or unofficial Department custom or policy of racial or gender discrimination or retaliation in disciplinary matters and matters of career advancement.

72.

At all times material to this Amended Complaint, it was clearly established law that governmental entities and their decision makers violate the Equal Protection Clause; 42 U.S.C. § 1981; and Title VII of the Civil Rights Act of 1964, as amended, by engaging in disparate discipline because of race and/or gender and by engaging in unlawful retaliation.

## Punitive Damages Allegations

### 73.

Cashin, Kraft, and McIntyre undertook all of the above-pled unlawful conduct intentionally, willfully, and maliciously with respect to the Plaintiffs and their federally protected rights.

### 74.

Additionally and, in the alternative, Cashin, Kraft, and McIntyre undertook all of the above-pled conduct with reckless disregard for Plaintiffs and their federally protected rights.

### COUNT I
### Race Discrimination - Equal Protection Clause
### (Asserted via 42 U.S.C. § 1983)
### All Defendants

### 75.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

### 76.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution entitles Plaintiffs to equal protection under the laws, including equal protection with respect to race.

77.

The Defendants disciplined Plaintiffs more harshly than their Caucasian coworkers based upon race.

78.

Additionally, the Defendants refused to award Plaintiffs advancement opportunities on account of their race.

79.

No compelling or other governmental interest supports the Defendants' use of race as the basis for the employment decisions giving rise to this Amended Complaint.

80.

To the extent any such interest existed, the Defendants' use of racial classifications is not the least restrictive means by which the Defendants could have effectuated such interest.

81.

The Defendants violated the Plaintiffs' rights to equal protection by subjecting them to racial discrimination.

82.

As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, Plaintiffs have suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

83.

The Defendants undertook all of the unlawful conduct giving rise to the Plaintiffs' claims while acting under color of State law.

84.

Defendant Cashin's unlawful conduct violated clearly established law.

85.

Defendant Cashin undertook her unlawful conduct intentionally and maliciously with respect to Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against her.

86.

Defendants Kraft's and McIntyre's unlawful conduct violated clearly established law.

87.

Defendants Kraft and McIntyre undertook their unlawful conduct intentionally and maliciously with respect to Plaintiffs and their federally protected

rights, entitling Plaintiffs to recover punitive damages against them.

88.

Additionally and, in the alternative, Defendants Cashin, Kraft, and McIntyre undertook their unlawful conduct recklessly with respect to the Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against them.

## COUNT II
### Race Discrimination - 42 U.S.C. § 1981
### (Asserted via 42 U.S.C. § 1983)
### All Defendants

89.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

90.

At all times material to this Complaint, Plaintiffs had employment agreements with the Department under which, *inter alia*, Plaintiffs worked for the Department and the Department compensated Plaintiffs for their work.

91.

Plaintiffs performed their contractual obligations.

92.

42 U.S.C. § 1981 prohibits the Defendants from discriminating against Plaintiffs on the basis of race with regard to the making and enforcing of their employment agreements with the Department. Plaintiffs' right to be free from race discrimination under 42 U.S.C. § 1981 includes the right to be free of race discrimination with respect to discipline and career advancement.

93.

Defendants violated the Plaintiffs' rights under 42 U.S.C. § 1981 by subjecting Plaintiffs to disparate discipline and failing to advance them because of their race.

94.

As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, Plaintiffs have suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

95.

The Defendants undertook all of the unlawful conduct giving rise to the Plaintiffs' claims while acting under color of State law.

96.

Defendant Cashin's unlawful conduct violated clearly established law.

97.

Defendant Cashin undertook her unlawful conduct intentionally and maliciously with respect to Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against her.

98.

Defendants Kraft's and McIntyre's unlawful conduct violated clearly established law.

99.

Defendants Kraft and McIntyre undertook their unlawful conduct intentionally and maliciously with respect to Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against them.

100.

Additionally and, in the alternative, Defendants Cashin, Kraft, and McIntyre undertook their unlawful conduct recklessly with respect to the Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against them.

<u>**COUNT III**</u>
**Race Discrimination - Title VII**
**Defendant Department of Corrections**

101.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

102.

At all times material to this Amended Complaint, Defendant Department of Corrections was an "employer," and Plaintiffs were Department "employees," as those terms are used under Title VII.

103.

Defendant Department violated the Plaintiffs' rights under Title VII by subjecting Plaintiffs to disparate discipline because of their race, and by failing to advance them because of their race.

104.

Defendant Department's above-pled discriminatory conduct toward Plaintiffs constitutes race discrimination in violation of Title VII.

105.

Defendant Department acted with malice or with reckless indifference to the federally protected rights of Plaintiffs.

106.

As a result of Defendant Department's unlawful actions, Plaintiffs have suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

107.

Plaintiffs are entitled to an award of back pay and benefits, compensatory damages, attorneys' fees, and all other appropriate damages, remedies, and other relief under Title VII and all federal statutes providing remedies for violations of Title VII.

<u>**COUNT III**</u>
**Race Discrimination – Fair Employment Practices Act**
**O.C.G.A. 45-19-20 *et seq*.**
**Defendant Department of Corrections**

108.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

109.

At all times material to this Amended Complaint, Defendant Department of Corrections was an "employer," and Plaintiffs were Department "employees," as those terms are used under FEPA.

110.

Defendant Department violated the Plaintiffs' rights under FEPA by subjecting Plaintiffs to disparate discipline because of their race, and by failing to advance them because of their race.

111.

Defendant Department's above-pled discriminatory conduct toward Plaintiffs constitutes race discrimination in violation of FEPA.

112.

Defendant Department acted with malice or with reckless indifference to the federally protected rights of Plaintiffs.

113.

As a result of Defendant Department's unlawful actions, Plaintiffs have suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

114.

Plaintiffs are entitled to an award of back pay and benefits, compensatory damages, attorneys' fees, and all other appropriate damages, remedies, and other relief under FEPA.

## COUNT IV
### Retaliation—Title VII
### Defendant Department of Corrections

### 115.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

### 116.

Title VII prohibits employers from retaliating against employees who report or oppose race discrimination.

### 117.

Defendants unlawfully retaliated against Plaintiffs, in violation of their rights under Title VII by, among other things, taking adverse employment actions against them because they each opposed and/or reported the racial discrimination to which they were subjected.

### 118.

Defendants' conduct constitutes unlawful retaliation in violation of Title VII.

### 119.

As a direct and proximate result of the Defendant Department of Corrections' violations of Title VII, Plaintiffs have suffered damages including

31

emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

## COUNT V
**Retaliation— Fair Employment Practices Act**
**O.C.G.A. 45-19-20 *et seq*.**
**Defendant Department of Corrections**

120.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

121.

FEPA prohibits employers from retaliating against employees who report or oppose race discrimination.

122.

Defendants unlawfully retaliated against Plaintiffs, in violation of their rights under FEPA by, among other things, taking adverse employment actions against them because they each opposed and/or reported the racial discrimination to which they were subjected.

123.

Defendants' conduct constitutes unlawful retaliation in violation of FEPA.

124.

As a direct and proximate result of the Defendant Department of Corrections' violations of FEPA, Plaintiffs have suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

**COUNT VI**
**Retaliation-- § 1981**
**(Asserted via 42 U.S.C. § 1983)**
**All Defendants**

126.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

127.

Section 1981 prohibits employers from retaliating against employees who report or oppose race discrimination.

128.

Defendants unlawfully retaliated against Plaintiffs, in violation of their rights under § 1981 by, among other things, taking adverse employment actions against them because they each opposed and/or reported the racial discrimination to which they were subjected.

33

129.

As a direct and proximate result of Defendants' violations of 42 U.S.C. § 1981, Plaintiffs have suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

130.

Defendants undertook all of the unlawful conduct giving rise to the Plaintiffs' claims while acting under color of State law.

131.

Defendant Cashin's unlawful conduct violated clearly established law.

132.

Defendant Cashin undertook her unlawful conduct intentionally and maliciously with respect to Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against her.

133.

Defendants Kraft's and McIntyre's unlawful conduct violated clearly established law.

134.

Defendants Kraft and McIntyre undertook their unlawful conduct intentionally and maliciously with respect to Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against them.

135.

Additionally and, in the alternative, Defendants Cashin, Kraft, and McIntyre undertook their unlawful conduct recklessly with respect to the Plaintiffs and their federally protected rights, entitling Plaintiffs to recover punitive damages against them.

136.

Defendants' conduct constitutes unlawful retaliation in violation of § 1981.

137.

As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

**COUNT VII**
**Gender Discrimination - Equal Protection Clause**
**(Asserted via 42 U.S.C. § 1983)**
**All Defendants**

138.

Plaintiffs incorporate each of the above factual allegations as if fully restated

here.

139.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution entitles Plaintiff Moultrie to equal protection under the laws, including equal protection with respect to gender.

140.

The Defendants disciplined Plaintiff Moultrie and other women employees more harshly than male employees. Additionally, Plaintiff Moultrie was passed over for promotion and other career advancement opportunities because of her gender.

141.

No compelling or other governmental interest supports the Defendants' use of gender as the basis for the employment decisions giving rise to this Amended Complaint.

142.

To the extent any such interest existed, the Defendants' use of gender classifications is not the least restrictive means by which the Defendants could have effectuated such interest.

143.

The Defendants violated the Plaintiff Moultrie's rights to equal protection by subjecting her to gender discrimination. The Defendants' conduct constitutes unlawful discrimination based upon gender, in violation of the Equal Protection Clause.

144.

The Defendants undertook all of the unlawful conduct giving rise to the Plaintiff Moultrie's claims while acting under color of state law.

145.

Defendant Cashin's unlawful conduct violated clearly established law prohibiting the making of discipline decisions because of gender and prohibiting career advancement decisions based on gender.

146.

As a direct and proximate result of the Defendants' violations of the Equal Protection Clause, Plaintiff Moultrie has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

147.

Defendants Cashin, Kraft, and McIntyre undertook their unlawful conduct intentionally and maliciously with respect to Plaintiff Moultrie and her federally protected rights, entitling Plaintiff Moultrie to recover punitive damages against them.

148.

Additionally and in the alternative, Defendants Cashin, Kraft, and McIntyre undertook their unlawful conduct recklessly with respect to the Plaintiff Moultrie and her federally protected rights, entitling Plaintiff Moultrie to recover punitive damages against them.

## COUNT VIII
### Gender Discrimination - Title VII
### Defendant Department of Corrections

149.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

150.

At all times material to this Amended Complaint, Defendant Department of Corrections was an "employer," and Plaintiff Moultrie was the Defendant's "employee," as those terms are used under Title VII.

151.

Defendant Department violated Plaintiff Moultrie's rights under Title VII by subjecting her to disparate discipline because of her gender and thwarting her efforts of career advancement because of her gender.

152.

Defendant Department's above-pled discriminatory conduct toward Plaintiff Moultrie constitutes gender discrimination in violation of Title VII.

153.

As a result of Defendant Department's unlawful actions, Plaintiff Moultrie has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

154.

Plaintiff Moultrie is entitled to an award of back pay and benefits, compensatory damages, attorneys' fees, and all other appropriate damages, remedies, and other relief under Title VII and all federal statutes providing remedies for violations of Title VII.

**COUNT IX**
**Gender Discrimination - Fair Employment Practices Act**
**O.C.G.A. 45-19-20 *et seq*.**
**Defendant Department of Corrections**

155.

Plaintiffs incorporate each of the above factual allegations as if fully restated here.

156.

At all times material to this Amended Complaint, Defendant Department of Corrections was an "employer," and Plaintiff Moultrie was the Defendant's "employee," as those terms are used under FEPA.

157.

Defendant Department violated Plaintiff Moultrie's rights under FEPA by subjecting her to disparate discipline because of her gender and thwarting her efforts of career advancement because of her gender.

158.

Defendant Department's above-pled discriminatory conduct toward Plaintiff Moultrie constitutes gender discrimination in violation of FEPA.

159.

As a result of Defendant Department's unlawful actions, Plaintiff Moultrie has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

160.

Plaintiff Moultrie is entitled to an award of back pay and benefits,

40

compensatory damages, attorneys' fees, and all other appropriate damages, remedies, and other relief under FEPA and all federal statutes providing remedies for violations of FEPA.

Prayer for Relief

Plaintiffs respectfully request that the Court:

(a)   declare that Defendants have violated Plaintiffs' rights under the federal statutes listed above;

(b)   permanently enjoin Defendants from violating, in the future, Plaintiffs' rights under any of the federal statutes listed above;

(c)   award Plaintiffs full back pay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(d)   award Plaintiffs prejudgment interest as required by law;

(e)   award Plaintiffs compensatory damages for emotional pain and suffering in an amount to be determined by the enlightened conscience of a jury;

(f)   award Plaintiff Moultrie reinstatement to her former position or that of a POIII; in lieu of same, front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

41

(g)     award Plaintiffs punitive damages, against Defendants Cashin, Kraft, and

McIntyre only, sufficient to punish them for their unlawful conduct and

deter him from repeating such conduct in the future, as determined by the

enlightened conscience of a jury;

(h)     award Plaintiffs reasonable attorneys' fees and expenses pursuant to 42

U.S.C. § 1988; and

(i)     grant such additional relief as may be just.

<u>DEMAND FOR JURY TRIAL</u>

The Plaintiffs demand a jury trial on all issues triable by jury.

Respectfully submitted this 29th day of August, 2013.

BUCKLEY & KLEIN, LLP

By:     <u>s/ Eleanor Mixon Attwood</u>
Eleanor Mixon Attwood
Georgia Bar No. 514014
emattwood@buckleyklein.com

Promenade II, Suite 900
1230 Peachtree Street NE
Atlanta, Georgia  30309
Telephone: 404-781-1100
Facsimile:  404-781-1101

Counsel for Plaintiffs